IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

KENNETH OGBONDAH,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        Case No. 5:07-cv-2353-TMP
                                     )
BENCHMARK ELECTRONICS                )
HUNTSVILLE, INC.,                    )
                                     )
        Defendant.                   )


**MEMORANDUM OPINION**

This matter is before the court on defendant's motion for summary judgment (Doc. #37), filed February 5, 2010. The motion is supported by a brief and evidentiary submission. Plaintiff has responded.[1] The defendant has replied. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c); accordingly, having carefully considered all of the arguments and evidence offered by both parties, the court enters this memorandum opinion regarding the motion for summary judgment.


STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[1] Plaintiff has not offered any evidence except to rely upon plaintiff's deposition, which was offered by defendant.

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

2

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need

not be given the benefit of every inference but only of every reasonable inference.  Brown v. City

of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


FACTS

For purposes of summary judgment, the following facts are considered undisputed:

Plaintiff Kenneth Ogbondah was hired by defendant Benchmark Electronics Huntsville, Inc.,

("BEHI") in 2004.  He is an African-American male over the age of 40.  In August of 2006, he

applied for two promotions at issue in this lawsuit: (1) program administrator;  and (2) in-process

quality auditor.[2]  The two jobs were posted internally at the workplace.[3]  The program administrator

position was approved prior to posting, which meant that senior management had granted the job

requisition request.  The posting described the qualifications for the job as follows:

> 1st - BS in business or related field and/or five years or more years in contract
> manufacturing in Programs position; customer service experience; strong
> communication and PC skills, Agile a plus.  Responsibilities are to interface with
> customers to meet satisfaction and performance goals set by management.  Manage
> SCNs/Forecast, claims, ECOs, daily commit to Customer.

---

[2]      The plaintiff has conceded that his claim relating to a third position, system administrator, is without merit because his claim relating to that position was based upon gender discrimination and the position was given to a male.  His claim relating to yet another promotion, to the position of planner III, was dismissed pursuant to the order granting in part defendant's motion to dismiss (Doc. 24).

[3]      Plaintiff makes much of the fact that, before any hiring decisions were made, he inquired about the status of his applications and was told they had been lost.  He was then allowed to fill out new applications, and those were considered.  At deposition, he referred to the applications as "shredded" by the defendants, but it is clear that he has no evidence to support such a conclusion. Because plaintiff is merely speculating as to some evil intent on the part of his employer, and because there is no dispute that the substituted applications were considered, the court views the loss of the original applications as wholly irrelevant to the instant motion for summary judgment.

4

(Def.'s Ex. B, Attachment A, p. 6).

The posting for the in-process quality auditor position was marked with a "UA" as unapproved, because the job requisition request had not been approved by senior management prior to posting.  The defendant has asserted that unapproved positions were often posted as a way of getting a "head start" on hiring if and when the position became approved.  The posting for the auditor position stated:

> 2nd shift – High School diploma or GED; good understanding of basic math and English communication skills.  One - two years experience in manufacturing, preferably electronics.  Must possess good PC skills – Word, Excel, etc.  Under general supervision, perform audits of manufacturing processes to work instructions and procedures, including inspecting product, as required; develop schedule for process audits.  review and audit manufacturing process for accuracy and completeness; record and report non-conformances to supervision; document nonconformances and follow-up on corrective actions taken to address non-conformances.

(Def.'s Ex. B, Attachment A, p. 4).

BEHI ultimately hired a younger female, Sarah Wakefield, to fill the position of program administrator.  Plaintiff saw a female employee, Becky Moore, performing the duties of the in-process quality auditor.  However, defendant asserts that the position of in-process quality auditor was never approved by upper management and never filled, and it has produced personnel records for Moore which indicate that she did not hold the in-process quality auditor position.

In April 2007, plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging that BEHI had discriminated against him on the basis of age, race, gender, and national origin.  He received a letter from the EEOC informing him that the agency would investigate

his claims. On September 28, 2007, he received his right-to-sue letter.  On December 28, 2007, he filed the complaint commencing this action.

Plaintiff asserts that he was denied the two positions because of his race, age, and gender.[4] He also asserts that he was retaliated against as a result of his complaints about discrimination.[5]  He asserts that the retaliation was inflicted by his supervisor, Karen Hampton, who assigned him to work on production lines other than the one to which he was usually assigned, and that the tasks on those lines were more physically demanding and less desirable.  In January 2008, plaintiff left his position on one of the production lines at BEHI to go to his car and get his cell phone.  He did not inform his supervisor that he was leaving, and he left the plant without "scanning out" by using his employee ID card, as company policy required .  Hampton gave him a written warning concerning

_____

[4]     The parties have not addressed the Supreme Court's recent decision concerning the analysis of age discrimination cases.  In Gross v. FBL Financial Services, Inc., ___ U.S. ___, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (June 18, 2009), the Court addressed whether a "mixed motive" jury instruction in an age discrimination case was proper.  In doing so, the Court concluded that the "mixed motive" theory was not available in age discrimination cases under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a), because the standard of proof in such a case requires the plaintiff to show that age was not simply "a motivating factor" in the adverse employment decision, but was the "but for" factor.  Here, plaintiff has not alleged that age was a "but for" reason for the discrimination.  Even so, because the court ultimately concludes that plaintiff has failed to prove his *prima facie* case of any type of discrimination, there is no need to force plaintiff to elect the form of discrimination he intends to pursue.

[5]     In its report and recommendation regarding the motion to dismiss, the court specifically stated that the retaliation claim involved only the "reprimand received after the initiation of this case." (Doc. 24, p. 17).  Plaintiff at oral argument attempted to assert that he was retaliated against by his supervisor, Karen Hampton, in that she subjected him to increased scrutiny by watching him frequently and asking him what he was doing.  A supervisor watching an employee closely and monitoring his work performance simply does not constitute retaliation and will not be discussed further herein, both because it does not merit further examination, and because any such claim, if pleaded, failed to survive the motion to dismiss.

his conduct.  When asked to sign the form that constitutes a written warning, plaintiff refused, and then resigned his job at BEHI.

<u>DISCUSSION</u>

Defendant BEHI seeks summary judgment on all of plaintiff's claims.  Defendant asserts that plaintiff has failed to prove a *prima facie* claim of discrimination in that he has failed to demonstrate that he was qualified for the position of program administrator, and that he has failed to demonstrate that the position of  in-process auditor was ever filled.  Finally, defendant asserts that plaintiff has failed to demonstrate that the actions complained of as retaliation were sufficiently adverse to constitute actionable retaliation, and that the plaintiff has failed to show any causal connection between the protected activity and the alleged retaliatory act.

A. Program Administrator

Obondah first alleges that BEHI discriminated against him on account of his age, race, and gender in that he was not promoted to the position of program administrator, and the job was awarded to Sarah Wakefield, a younger, white female.  Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).  Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate
> against any individual with respect to his compensation, terms, conditions or

7

privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a *prima facie* case of discrimination by establishing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he is qualified to do the job; and (4) his employer treated similarly situated employees who are not members of the protected class more favorably. See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). A disparate treatment claim requires proof of discriminatory intent, either through the use of direct or circumstantial evidence. See, e.g., Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).

In order to establish a *prima facie* case of race discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the employment decision," Eskra v. Provident Life and Accident Ins. Co., 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination. Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1457 (11th Cir. 1997). Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions. Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989). Where there is no direct evidence, the plaintiff must prove intent through circumstantial evidence in accordance with McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). When the plaintiff relies upon circumstantial evidence, rather than direct evidence, he

8

creates a presumption of discrimination by establishing a *prima facie* case.  The presumption may be rebutted, however, if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the preferred reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g *en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

It is not the duty of this court to evaluate whether the employment decisions made with respect to Ogbondah were fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Questionable business judgment is not evidence of discrimination.  See id.  Moreover, courts have recognized that the discrimination laws should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential."  Magruder v. Selling Area Mktg. Inc., 439 F. Supp. 1155 (N.D. Ill. 1977).

The plaintiff asserts that he was denied a promotion to program administrator because of his race and/or gender.[6]  Defendant asserts that Ogbondah was not qualified for the position because he did not have the requisite experience in customer service or "strong communication skills."  A plaintiff may prove a *prima facie* case of discriminatory denial of a promotion by establishing the

---

[6]     As discussed *supra* in footnote 4, the age discrimination claim need not be examined separately herein.

following: (1) that he is a member of a protected class; (2) that he was qualified for the promotion; (3) that he was rejected despite his qualifications; and (4) that the position was filled with an individual outside the protected class.  Vessels v. Atlanta Ind. School Sys., 408 F.3d 763, 768 (11th Cir. 2005);  Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000).[7]   In this case, Ogbondah is a member of the protected class, and was rejected for the position, which was filled by a Caucasian female, Sarah Wakefield.  The question for the court is whether Ogbondah has demonstrated that he was qualified for the position.[8]

The parties do not dispute that both Ogbondah and Wakefield had the necessary college education or work experience as set forth in the first clause of the job requirements.[9]  At issue are the requirements of "customer service experience" and "strong communication ... skills."  Because qualification is an element of the *prima facie* showing, it is the plaintiff's burden to show that he was qualified.  In this case, the plaintiff has the burden of demonstrating that he possessed the customer service experience and communication skills necessary, and that he made those qualifications

---

[7]      A *prima facie* showing does not require plaintiff to show that he was more qualified than the persons promoted, although the qualifications may be relevant to rebuttal of defendant's non-discriminatory reason.  Vessels, 408 F.3d at 769.

[8]      The court is not engaging in a comparison of Ogbondah's qualifications and Wakefield's, as might be relevant to the issue of whether BEHI's reason given for hiring Wakefield was a pretext.  BEHI does not rely upon the defense of a nondiscriminatory reason (that she was better qualified) for hiring Wakefield; BEHI rests solely on its contention that Ogbondah was unqualified.

[9]      Plaintiff's argument that Wakefield did not have the requisite business degree is without any basis in fact, and unsupported by any evidence.  To the contrary, the evidence indicates that Wakefield had a bachelor's degree in two business-related fields.  Plaintiff had a bachelor's degree in accounting, as well as a master's degree in business administration.  The published job qualifications, however, clearly require only a bachelor's degree in a "business-related" field.

known.[10]  In support of his *prima facie* claim, Ogbondah argues that his position at BEHI as a test technician "required regular interface with the customers" and that his other work preparing taxes "inherently involves some customer service."  The only support for this argument is the following deposition excerpts:

> Q.  How long have you been preparing taxes?
>
> A.  I started doing people's taxes about 15 years ago.  Yeah, something like that.
>
> * * * *
>
> Q.  On a weekly basis, how often did you interact with the customers of the library line?
>
> A.  I – it's not certain.
>
> Q.  Okay.
>
> A.  They can come two times in one day.  They can come – not at all in a month.

(Depo. of Ogbondah, pp. 52-53, 129-130).  Plaintiff does not assert that his application form included any reference to his communication skills or customer service experience.  In fact, the application form for the program administrator position, which asks the applicant to "[l]ist any skills or experience that would help you meet job requirements," contains the following handwritten "list": "With an advanced Education in Business I am confident that I can meet job requirements."  (Def.'s Ex. B, Attachment B).  The resumè submitted for the program administrator position does not

---

[10]     It simply goes to reason that a plaintiff cannot assert a discrimination claim where the employee possessed certain skills or traits, but did not make that fact known during the hiring process.

11

reference any customer service experience or communication skills.[11]  Moreover, the single page contains a misspelling of the word "accounting," and simply lists the courses he took in high school and college.  The plaintiff's assertion that he was qualified for the program administrator position regarding customer service experience and communication skills rests on assumptions.  He assumes that his employer knew he was a tax preparer, and that tax preparation "inherently" involved customer service, and that because he occasionally encountered customers at BEHI, these encounters provided him with customer service experience.  There is no evidence supporting an inference that BEHI ever knew that plaintiff claimed customer service experience, or was otherwise aware of his experience.

He does not cite any evidence to support his contention that he possessed the communication skills necessary for the job, and a reading of his deposition, resumè, and application indicates that Ogbondah was not a skillful speaker or writer of English.   Because it is undisputed that customer service experience and strong communication skills were required for the program administrator position, plaintiff has failed to meet his burden of proving that he was qualified for the job.  Accordingly, the defendant's motion for summary judgment with regard to the program administrator job is due to be granted.[12]

---

[11]      The resumè submitted for the in-process quality auditor position contained a second page, which states that he worked as a senior tax preparer for over ten years.  That page, however, is not attached to the resumè sent in reference to the program administrator position.  Moreover, even if the resumè for the other position were relevant to the instant position, it contains three misspelled words, and further evidences a lack of written communication skills.

[12]      While the oral argument on this issue involved a lengthy discussion of Wakefield's experience or skills, her qualification is not relevant to the plaintiff's *prima facie* showing.  Plaintiff does not argue that customer service experience or strong communication skills were not actually required by BEHI; he simply argues that his experience was better than Wakefield's.  As discussed

B.  In-Process Quality Auditor

The defendant seeks summary judgment on plaintiff's claim that he was discriminatorily denied a promotion to the position of in-process quality auditor on grounds that the position was never filled.  BEHI asserts that while a "UA" posting for the position was advertised, upper management never approved the position of in-process quality auditor, so it was never filled by any employee.  Defendant asserts that plaintiff fails to meet his *prima facie* burden because he cannot demonstrate that the position was filled with someone outside the protected class.

Plaintiff's only evidence that the position was filled is that Becky Moore told him she had gotten the job, and that he saw her perform the duties of the auditor position.  The defendant has moved to strike the hearsay statements relating to what plaintiff says Moore told him, which are offered to prove the truth of the assertion that she was given the promotion.  (Doc. # 44).  The defendant has not filed any opposition, and the court agrees that Moore's alleged statement is hearsay; therefore, the motion is due to be granted.

Plaintiff then is left with his testimony that he saw Moore performing the duties of the in-process auditor.  The defendant has rebutted that testimony by offering evidence that BEHI never filled the in-process quality auditor position. (Def.'s Ex. B, Attachment A, ¶ 9).  In addition, defendant has asserted that Moore held the position of in-process inspector II during all of her employment with BEHI, until she was terminated as part of a reduction in force.  Accordingly,

---

*supra,* the court is not required to determine whether Wakefield's qualifications were superior to plaintiff's; such a discussion would be relevant to a showing of pretext, but not to a challenge to the *prima facie* case.  Moreover, it is clear that Wakefield did present in her application form concrete evidence that she had worked in the field of customer service.

plaintiff has failed to offer any evidence that the position for which he applied was awarded to anyone outside of his protected class of age, race, or gender.  Absent some evidence to dispute BEHI's assertion that the position was never filled, there is no genuine issue of material fact concerning the lack of this element of the *prima facie* showing.  Therefore, the motion for summary judgment also is due to be granted as to this position.

C.  Retaliation

Plaintiff's final claim is that he was subjected to retaliation after filing the instant action.  He asserts that he felt harassed.  In support of his claim, he cites to the following testimony:

> A. ... My – my supervisor's actions were surprising.  I've been – I might be working now.  She would slip behind me to see what I'm doing, if I'm really working or not.  She had made several comments that she had never made before to me, asking me what are you doing and all this kind of thing.

(Depo. of Ogbondah, p. 178).  He further asserts that his supervisor assigned him to tasks on different production lines:

> Q. Okay.  So she asked you to go to a different product line?
>
> A. Yes.  She's not supposed to send me there.  We send – we send people based on, one, if they are not doing anything, two, if they – you don't send a person who has been working there, has experience, to go to another section to work when new people who should go to help somewhere out there.

(Depo. of Ogbondah, p. 185).  He further contends that the tasks to which he was assigned included one machine that could scratch the worker's hands, and one assignment that included lifting a heavy

14

machine.  He never complained about the temporary assignments, and he never asked why he was being reassigned.  He describes the other assignments as jobs for "new people," and not for him because he was "old."  (Depo. of Ogbondah, p. 200).

Ogbondah further maintains that his supervisor no longer treated him cordially:

> Q.  Okay., What about her attitude was not normal with you anymore?
>
> A.  Before; she see me, she would talk with me.  She would laugh with me.  We would discuss anything that I worried about certain things about the job.  But she never did it anymore.  She see me, she frown at my face and pass.  But she's aware of my actions so she wasn't friendly with me anymore.

(Depo. of Ogbondah, pp. 190-91).

The first question presented here is whether the actions complained of --- temporary reassignment to less desirable tasks, additional supervision, and a lack of friendliness --- can constitute retaliation.

The Supreme Court has noted that Title VII provides a broader definition of retaliatory conduct than discriminatory conduct.  In <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 126 S. Ct. 2405 (2006), the Court explained:

> The language of the substantive provision differs from that of the anti-retaliation provision in important ways. Section 703(a) sets forth Title VII's core anti-discrimination provision in the following terms:
>
> "It shall be an unlawful employment practice for an employer-
>
> "(1) to *fail or refuse to hire or to discharge* any individual, or otherwise to discriminate against any individual *with respect to his compensation, terms, conditions, or privileges of employment*,

because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way *which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee*, because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a) (emphasis added).

Section 704(a) sets forth Title VII's anti-retaliation provision in the following terms:

"It shall be an unlawful employment practice for an employer *to discriminate against* any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e-3(a) (emphasis added).

The underscored words in the substantive provision – "hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee" – explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace. No such limiting words appear in the anti-retaliation provision.  Given these linguistic differences, the question here is not whether identical or similar words should be read *in pari materia* to mean the same thing. See, *e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 355, n. 2, 125 S. Ct. 1766, 161 L. Ed. 2d 619 (2005); McFarland v. Scott, 512 U.S. 849, 858, 114 S. Ct. 2568, 129 L. Ed. 2d 666 (1994); Sullivan v. Everhart, 494 U.S. 83, 92, 110 S. Ct. 960, 108 L. Ed. 2d 72 (1990). Rather, the question is whether Congress intended its different words to make a legal difference.  We normally presume that, where words differ as they differ here, "'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983).

There is strong reason to believe that Congress intended the differences that its language suggests, for the two provisions differ not only in language but in purpose as well.  The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-801, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  The anti-retaliation provision seeks to secure that

primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct.

To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination. The substantive provision's basic objective of "equality of employment opportunities" and the elimination of practices that tend to bring about "stratified job environments," *id.*, at 800, 93 S. Ct. 1817, would be achieved were all employment-related discrimination miraculously eliminated.

But one cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the anti-retaliation provision's objective would not be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace. See, *e.g., Rochon v. Gonzales*, 438 F.3d, at 1213 (FBI retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (C.A.10 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination). A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the anti-retaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).

548 U.S. at 61-66.

Burlington instructs that the anti-retaliation provision protects an employee from retaliation which "a reasonable employee would have found 'materially adverse,'" which means that the retaliatory conduct would "dissuade[] a reasonable employee from making or supporting a charge of discrimination." 548 U.S. at 68. The applicable standard is meant to "screen out trivial conduct"

17

but still "capture" the retaliation that may prevent employees from complaining of discrimination. 548 U.S. at 70.

Applying the standard enunciated in Burlington to this case, the plaintiff has failed to present evidence that defendant's actions may constitute actionable retaliatory conduct. Certainly, "frowning" at the employee is "petty and trivial" and should not be considered "materially adverse" so as to trigger the protection of the anti-retaliation provision.  See  Crawford v. Carroll, 529 F.3d 961, 974 n. 13 (11th Cir. 2008).  Similarly, looking at what the plaintiff is doing and making sure that he is working is not a "materially adverse" action that would dissuade a reasonable employee from complaining of discrimination.  Indeed, supervising an employee would seem to be the essence of being a supervisor.

While it can be argued that placing the plaintiff in a different job, even temporarily, that is "dangerous and demeaning" could not constitute a retaliatory action, in this instance plaintiff's evidence falls short of demonstrating that the tasks were dangerous or demeaning.  Rather, his testimony paints the positions as less desirable and more physically demanding.  At best, plaintiff offers evidence only that he was assigned to work on a "spooning" machine on the "Predator" production line that could scratch the employee's hand using the machine.  (Depo. of Ogbondah, pp. 199-200).  He also was assigned to assist with loading and shipping on the "Sun" and "Galaxy" production lines, which entailed occasional help to lift heavy machinery.  (Depo. of Ogbondah, pp.185-189, 199-204).  Plaintiff contends these jobs should have been assigned to newer and younger employees.  Nothing in plaintiff's description of these jobs makes them "dangerous and demeaning."  Although there are unpleasant jobs in most production facilities, the jobs must be

performed for the plant to operate.  It is only these job assignments that might dissuade a reasonable

employee from complaining about discrimination which are "materially adverse" for retaliation

purposes.  As the Supreme Court explained in Burlington, a case in which the plaintiff was

reassigned from forklift duty to "track laborer":

> To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U. S., at 81. But here, the jury had before it considerable evidence that the track laborer duties were "by all accounts more arduous and dirtier"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job and the male employees resented White for occupying it." 364 F. 3d, at 803 (internal quotation marks omitted).  Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 71, 126 S. Ct. 2405 (2006).

Missing from the evidence in this case are "all the circumstances" mentioned by the Supreme Court.

Plaintiff was not permanently reassigned to other production lines, but sent to work on them only

as needed.  Although plaintiff has indicated that employees did not like working on the "spooning"

machine, and, thus, it was regarded by employees as a less desirable job assignment, the evidence

falls hort of showing that it was so undesirable that a "reasonable employee" would be dissuaded

from opposing discriminatory practices.  Likewise, the occasional heavy lifting required for loading

and shipping is not so undesirable that it would affect a reasonable employee's willingness to

complain about discrimination.  "[R]eassignment of job duties is not automatically actionable," a

plaintiff must present evidence from which a reasonable jury could find that the reassignment was

so undesirable that it was dissuade a reasonable employee from pursuing his rights under Title VII. That is not the case here.

Even if the temporary assignments here were "materially adverse" within the teachings of Burlington, they cannot be deemed retaliatory unless they were causally connected to the plaintiff's protected activity. To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events. Goldsmith v. Bagby Elevator Co, Inc., 513 F.3d 1261, 1277 (11th Cir. 2008), citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2410-16, 165 L. Ed. 2d 345 (2006). While the causal link is broadly construed to require plaintiff to prove little more than that the adverse action and the protected activity were not "wholly unrelated," it nevertheless is well settled that the plaintiff "must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Goldsmith, 513 F.3d at 1278. It is not sufficient that plaintiff merely show that someone in the defendant's organization knew of the protected activity; rather, the plaintiff must show that the person who engaged in the alleged retaliatory act was aware of the protected activity. See Tucker v. Housing Authority of Birmingham, 229 Fed. Appx. 820, 2007 WL 10345761 (11th Cir. 2007). The Eleventh Circuit Court of Appeals has clearly stated that "summary judgment cannot be avoided based on hunches unsupported with significant probative evidence." Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1198 (11th Cir. 1997).

It is at this juncture that Ogbondah's retaliation claim based on the temporary reassignments fails. He asserts that the work reassignments were made by his supervisor, Hampton, but he simply

20

presents no evidence that Hampton's conduct was caused by or motivated by his complaints of discrimination.  In fact, plaintiff has offered no evidence that Hampton knew that he had filed a lawsuit.  His evidence of causation is simply his own speculation that she went to meetings where that sort of thing must have been discussed, and that the plant "grapevine" was aware of his lawsuit. Specifically, plaintiff's counsel cites to the following as evidence:

> Q.  Okay.  In your first response to interrogatories, you mention that she was a person with knowledge regarding this matter.  What information do you believe she has?
>
> A.  Okay.  what – only information she had because she's got to work for the company.  The only information she had was that I went and told her that, Do you believe they are throwing away my application that I filed before?  She said, Really? I said, Yes.  I go get it from them.  That's the one lady that didn't throw away my application.  That was the second application that they're showing you now.  The first one, I believe, was shredded.
>
> Q.  Okay.
>
> A.  She signed a new one for me.
>
> Q.  Okay.
>
> A.  That's all she said, and that's all she did.

(Depo. of Ogbondah, pp. 96-97).  In the cited testimony, plaintiff is referring to a time before he was denied the promotions, and before he engaged in any protected activity.  He simply alleges that Hampton knew that the HR department had told him that they could not find his applications, and that problem was remedied when he filled out new applications, which Hampton signed.  Plaintiff apparently engaged in no further discovery to determine what Hampton knew about his allegations

of discrimination, his EEOC charge, or his lawsuit – or when she knew it. In his deposition, Ogbondah described his "knowledge" of what Hampton knew as follows:

> Q. Okay.  Now, let me back up a little bit further when we were talking about the executive committee and the meetings where they would talk about everything going on with the plant.  How do you know that the fact that you had filed an EEOC complaint or a – or a complaint in civil court was discussed in that meeting?
>
> A. That's my guess, my – that's my guess that has happened because who is answering those letters?
>
> Q. What letters?
>
> A. When EEOC reply.  It's somebody working in the plant that's answering it.
>
> Q. Okay.
>
> A. And what else can anybody say?  An organization like that?  It's common with grapevine stories going around, what has happened and what has not happened.  I didn't specifically have any evidence to show yeah, she's aware, but I know she's aware of what was going on.

(Def.'s Ex. A, Depo. of Ogbondah, pp. 199-200).  Plaintiff disingenuously asserts that this testimony is evidence that Hampton was "one of the BEHI employees that were [sic] questioned" during the EEOC investigation; however, he clearly states that the testimony is only "his guess."  Such conjecture, like the "hunch" in Raney, falls far short of meeting the burden that lies with the plaintiff in showing a *prima facie* case of retaliation.  There simply is no evidence that Hampton knew of plaintiff's EEOC charge or this lawsuit at the time she sent him to work on other production lines.

Plaintiff's final assertion of a claim of retaliation rests upon the written reprimand issued to him by Hampton.  While a reprimand is a more substantial and adverse action, this claim also must fail.  First, as discussed, plaintiff has failed to show that Hampton knew of the protected activity when she issued the written warning.  Second, plaintiff has failed to show any causal relation between the reprimand and the protected activity.  Third, plaintiff admits that he engaged in the conduct --- leaving his position and exiting the building without following procedures --- for which he was reprimanded.  To find that an employer cannot discipline an employee who has engaged in a protected activity, even when that employee admits breaking the rules of the workplace, transforms the anti-discrimination laws into a free pass for workers who have complained.[13]   The result plaintiff seeks here is unsupported in law or fact.

Accordingly, there is simply no evidence which may be construed as giving rise to a presumption that the acts complained of were retaliatory.   The defendant's motion for summary judgment as to the final claim of retaliation also is due to be granted.

---

[13]     The court is cognizant of the plaintiff's assertion that the written warning he was given did not follow office protocol because it was not preceded by an oral warning.  However, the assertion is not supported by any showing as to what defendant's protocol was, or why it may have been ignored.  The exhibit referenced by plaintiff, which was supplied by defendant as Attachment F, is simply a copy of the "employee problem report."  Although there is a list of types of discipline, it does not provide any evidence from which the court could conclude that BEHI maintained a progressive disciplinary policy, as plaintiff asserts, or that every infraction must first result in only a verbal warning.

CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented and the law governing this action, this court determines that defendant BEHI's motion for summary judgment against plaintiff Ogbondah (Doc. #37) is due to be GRANTED and all of plaintiff's claims are due to be DISMISSED WITH PREJUDICE. In addition, BEHI's motion to strike (Doc. # 44) also is due to be and hereby is GRANTED

A separate order will be entered in accordance with the findings set forth herein.

DATED the 19th day of May, 2010.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

24